**Opinion issued March 5, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00419-CR

———————————

**KHARI TY KENDRICK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1577093**

---

## MEMORANDUM OPINION

Khari Ty Kendrick was convicted by a jury of capital murder. *See* TEX. PENAL CODE § 19.03(7)(a). The trial court sentenced him to life without parole. Kendrick was arrested following a traffic stop. On appeal, he argues that the trial court reversibly erred by denying his motion to suppress evidence obtained from

the stop. He also argues that the trial court reversibly erred by polling only 11 of 12 jurors after they reached a verdict. We affirm.

**Background and Relevant Facts**

Kendrick was a suspect in a double homicide of a couple at their home in Houston. Over a period of days, officers observed a car traveling back and forth between the house where the couple was found murdered and an apartment complex. Eventually, the officers requested a traffic stop of a car leaving the apartment complex. Kendrick was a passenger in the car that was stopped, and his girlfriend was the driver. Kendrick was arrested, and eventually, he was charged with the murders. After trial, the jury convicted him of capital murder, and the trial court sentenced him to life without parole.

## A.     Pretrial Hearing

Before trial, Kendrick moved to suppress testimony and evidence found during the traffic stop.[1] He argued that the traffic stop was illegal because the officer did not have reasonable suspicion to stop the car.

At the pretrial hearing, Harris County Sheriff's Deputy T. Garza testified that on January 17, 2018 around 3:00 a.m., he received notice to look out for a black Toyota Corolla possibly heading westbound through his patrol area on FM

---

[1]     Specifically, he argued that the trial court should exclude a backpack and its contents including items stolen from the complainants, Kendrick's cell phone, and the police officers' identifications of Kendrick at the scene of the traffic stop as being the same person they recognized from video surveillance from the scene of the homicide.

2

1960. FM 1960 is an east-west roadway with three lanes in each direction and a center lane designated for turning. The weather that night included freezing temperatures and wind, and the roads were wet and icy.

Deputy Garza spotted the black Corolla ahead of him approaching an intersection at Fallbrook. The Fallbrook intersection has a 24-hour gas station. Deputy Garza traveled behind the Corolla in one of the inside lanes of FM 1960. As Deputy Garza followed behind, the Corolla changed lanes mid-intersection at Fallbrook. This took the car closer to the right-hand side of the roadway, near the 24-hour gas station. Deputy Garza considered this lane change unsafe because of the inclement weather and the danger of a collision with cars turning onto FM 1960 from Fallbrook or cars leaving the gas station. He testified that the area was heavily traveled at all hours.

Deputy Garza activated his emergency lights and made a traffic stop. Once he spoke with the driver, he smelled the odor of marijuana. The driver also lacked a driver's license and proof of insurance. Deputy Garza and another officer detained both the driver and the passenger, who is the appellant here.

Sergeant J. Brown testified that he traveled to the traffic stop location after receiving notice of it. He confirmed there was a strong odor of marijuana coming from the car. Sergeant Brown searched the car and found additional marijuana. In the process, he also found a clear bag with a large amount of loose jewelry. He

3

recognized the jewelry as items stolen from the house where the couple was murdered. He also recognized Kendrick from surveillance of the homicide victims' neighborhood. Kendrick and his girlfriend told officers inconsistent stories of the ownership of the jewelry. Kendrick was taken into custody and driven to the station house. At the station, he was given his *Miranda* warnings, and he waived his rights. Kendrick also signed a consent to search his cell phone.[2]

At the hearing, Kendrick's attorney argued that Deputy Garza did not have reasonable suspicion to conduct a traffic stop. He argued that the lack of other cars in the intersection defeated Deputy Garza's conclusion that the Corolla had changed lanes unsafely. The State responded that the lane change occurred at 3:00 a.m. on a busy, yet icy, street. A lane change with those road conditions toward potential traffic from neighborhoods and a 24-hour gas station was unsafe and gave the officer reasonable suspicion to stop the car, the State argued. The trial court denied the motion to suppress.

**B.    Findings of Fact and Conclusions of Law**

The trial court's findings of fact and conclusions of law included that Deputy Garza was credible. The court found that Deputy Garza testified that the road conditions were dark and icy at the time of the stop. Deputy Garza believed that the Corolla's lane change as it passed through the Fallbrook intersection was

---

[2]    Kendrick testified at the pretrial hearing, but his testimony is not relevant to whether Deputy Garza had reasonable suspicion to stop the car.

4

unsafe "because of the inclement weather along with the traffic potentially coming out of a 24-hour [gas station] and a neighborhood located on the other side of the intersection." The trial court found that Deputy Garza had reasonable suspicion that the Texas Transportation Code had been violated.

## Motion to Suppress

Kendrick challenges the trial court's denial of his motion to suppress. He argues the court erred in denying the motion because the responding officer lacked reasonable suspicion to conduct a traffic stop of his girlfriend's car.

## A.     Standard of Review and Applicable Law

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Hardin*, 664 S.W.3d 867, 871 (Tex. Crim. App. 2022). We give almost total deference to a trial court's determination of historical facts and credibility when supported by the record. *Id.* We also afford almost total deference to a trial court's ruling on mixed questions of law and fact if the resolution to those questions turns on the evaluation of credibility and demeanor. *Id.* When the trial court makes explicit fact findings, as the trial court did in this case, we determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports these fact findings. *Id.* We review legal conclusions de novo. *Id.* Likewise, we review de novo mixed questions of law and fact that do not turn on credibility and demeanor. *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim.

5

App. 2013); *see also State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012) (holding that "[w]hen the posture of a case . . . presents only questions of the validity of the trial court's legal rulings . . . an appellate court's review is de novo.") (internal quotations omitted).

"A warrantless traffic stop is a Fourth Amendment seizure that is analogous to temporary detention; thus, it must be justified by reasonable suspicion." *Hardin*, 664 S.W.3d at 872. If an officer has reasonable suspicion that a driver has committed a traffic violation, the officer may conduct a traffic stop. *Id.* Reasonable suspicion for a traffic stop exists "if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaged in criminal activity." *State v. Cortez*, 543 S.W.3d 198, 204 (Tex. Crim. App. 2018) (internal citation omitted). We review a reasonable suspicion determination by considering the totality of the circumstances. *Id.*

Texas Transportation Code section 545.060(a) provides that an operator on a roadway divided into two or more clearly marked lanes for traffic "(1) shall drive as nearly as practical entirely within a single lane; and (2) may not move from the lane unless that movement can be made safely." TEX. TRANSP. CODE § 545.060(a).

6

**B.     Analysis**

On appeal, the parties do not dispute that the car failed to maintain a single lane. *See* TEX. TRANSP. CODE § 545.060(a)(1). The dispute is whether the trial court could reasonably conclude that the lane change movement was unsafe. *See id.* § 545.060(a)(2); *see also Hardin*, 664 S.W.3d at 873–74 (interpreting section 545.060(a) to require both that driver fails to maintain single lane and that driver does so unsafely). Kendrick argues that there is no evidence that the lane change was unsafe. He argues that the lane change was not unsafe simply because the weather was unusually cold and roads were icy. He also argues that the safety of the lane change is proven by the fact that there was no collision nor near-collision with a pedestrian, car, or curb.

To justify the stop, it is sufficient show that the officer reasonably believed that a traffic violation was in progress. *Drago v. State*, 553 S.W.2d 375, 377–78 (Tex. Crim. App. 1977) (if officer has reasonable basis for suspecting person committed traffic offense, officer may initiate traffic stop). Deputy Garza testified that the 24-hour gas station was in the heavily traveled intersection and that the intersection had traffic around the clock because of the nearby neighborhood and apartments. Deputy Garza also testified that temperatures were very cold and there was ice and water on the roadway. From this testimony, the trial court could infer that the roadway was dark, icy, and highly traveled. Given the weather and road

conditions, the trial court could conclude that changing lanes in the intersection toward the right side, which was in the direction of where cars would either be turning from Fallbrook onto FM 1960 or exiting from the 24-hour gas station, was unsafe. The trial court could have determined that Deputy Garza had a reasonable basis for suspecting that the driver had committed a traffic offense, and could, therefore, legally initiate a traffic stop. *Hardin*, 664 S.W.3d at 872. We overrule Kendrick's first issue.

## Jury Poll

In his second issue, Kendrick contends that the trial court reversibly erred because its poll of the jury omitted one juror. At the conclusion of the trial, Kendrick requested and received a jury poll. *See* TEX. CODE CRIM. PROC. art. 37.05(a). The court asked the jurors one by one, "is this your verdict?" The court did not ask one of the twelve jurors for a response.

Article 37.05 provides that the State or a defendant may have the jury polled, and if any juror answers negatively, the jury shall retire again to consider its verdict. TEX. CODE CRIM. PROC. art. 37.05. Kendrick did not object after the court polled 11 of the 12 jurors. He did not ask for the remaining juror to be polled, and he did not ask the trial court to retire the jury for additional deliberations. Kendrick thus waived any complaint for appellate review. *Reese v. State*, 773 S.W.2d 314, 317 (Tex. Crim. App. 1989) ("A poll of the jury must be requested or it is

8

waived."); *Bradley v. State*, No. 01-12-00713-CR, 2014 WL 1516183, at \*6 (Tex. App.—Houston [1st Dist.] Apr. 17, 2014, pet. ref'd) (mem. op., not designated for publication) (appellant waived jury polling complaint by failing to object when one juror changed answer from "no" to "yes" when polled); *Adair v. State*, No. 03-11-00318-CR, 2013 WL 6665033, at \*5 (Tex. App.—Austin Dec. 12, 2013, no pet.) (mem. op., not designated for publication) (unpreserved complaints about procedure for polling jury and confirming verdict are waived); *see also* TEX. R. APP. P. 33.1(a).

We overrule Kendrick's second issue.

## Conclusion

We affirm the judgment of the trial court.

Peter Kelly
Justice

Panel consists of Justices Kelly, Hightower, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).